# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 23-1809V

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

REBECCA DRYER-MINNERLY,

             Petitioner,

v.

SECRETARY OF HEALTH AND
HUMAN SERVICES,

             Respondent.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Special Master Jennifer A. Shah

Filed: April 27, 2026

*Bridget C. McCullough*, Muller Brazil, LLP, Dresher, PA, for Petitioner.
*Katherine Edwards*, U.S. Department of Justice, Washington, DC, for Respondent.

## DECISION DENYING ENTITLEMENT[1]

On October 16, 2023, Rebecca Dryer-Minnerly ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program,[2] alleging that she developed Guillain-Barré syndrome ("GBS") and/or experienced significant aggravation of her pre-existing small fiber neuropathy as a result of the influenza ("flu") vaccination she received on October 14, 2021. Pet. at 1 (ECF No. 1). Petitioner later amended her petition. The Amended Petition no longer alleged that Petitioner suffered GBS and/or a significant aggravation of her SFN caused by the subject flu vaccination; instead, it alleged she suffered trigeminal neuralgia ("TN") caused by the vaccination. Am. Pet. at 1 (ECF No. 47).

---

[1] Because this Decision contains a reasoned explanation for the action in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3758, codified as amended at 42 U.S.C. §§ 300aa-10 through 34 (2012) ("Vaccine Act" or "the Act"). Individual section references hereafter will be to § 300aa of the Act (but will omit that statutory prefix).

Petitioner has not produced any expert opinion in support of her allegations, and the filed medical records do not adequately substantiate her claim. Accordingly, I conclude she is not entitled to compensation.

## I.        Procedural History

Petitioner, initially represented by Ms. Phyllis Widman, filed the petition on October 16, 2023. After filing the petition, Petitioner filed an affidavit and several medical records. Exs. 1-28. On July 19, 2024, Respondent filed a Rule 4(c) Report arguing that entitlement should be denied. Resp't's Rep. at 1 (ECF No. 22). Respondent asserted Petitioner had failed to establish a Table injury for GBS, as the onset of her symptoms occurred prior to her flu vaccination; her symptoms did not meet any of the criteria for a GBS subtype; and her pre-existing diagnoses of chronic inflammatory demyelinating polyradiculoneuropathy ("CIDP") and neuropathy were more likely explanations for her symptoms. *Id.* at 14. Respondent also argued that Petitioner failed to establish causation for an off-Table claim, because she had not provided an expert report, nor other reliable medical evidence, to support her injury claims. *Id.* at 16.

On August 13, 2024, this case was reassigned to me. ECF Nos. 24, 25. The same day, I ordered Petitioner to file additional medical records sought in the Rule 4(c) Report and to file a status report stating how she would like to proceed. *See* non-PDF Scheduling Order dated 8/13/2024. Petitioner filed further medical records on August 20 and October 15, 2024, and moved for additional time to file the remaining outstanding records. Exs. 29-33. I granted that motion and set a December 13, 2024 deadline for her to file an expert report. *See* non-PDF Order Granting Motion for Extension of Time dated 10/16/2024.

On December 13, 2024, Petitioner moved for additional time to file her expert report. ECF No. 33. I granted that motion, extending the deadline to February 11, 2015. *See* non-PDF Order Granting Motion for Extension of Time dated 12/16/2024. On February 11, 2025, Petitioner filed a second motion for an extension of time to file her expert report. ECF No. 37. I granted that request the next day, setting a March 28, 2025 deadline. *See* non-PDF Order Granting Motion for Extension of Time dated 2/12/2025.

Petitioner did not file either an expert report or a motion for an extension of time by March 28, 2025. My law clerk contacted Ms. Widman by email on April 1 and 7, 2025, inquiring about the missed deadline. *See* Informal Communication (Remark) from Chambers dated 4/21/2025. Ms. Widman responded on April 7, 2025, apologizing for the missed deadline, but she did not file anything. *Id.* On April 11 and 15, 2025, my law clerk sent further emails to Ms. Widman but received no response. *Id.* On April 21, 2025, I *sua sponte* allowed Petitioner another 30 days, until May 21, 2025, to file the expert report. *See* non-PDF Scheduling Order dated 4/21/25.

On May 27, 2025, Petitioner filed a third motion for an extension of time, seeking until July 11, 2025, to file her expert report. ECF No. 38. I granted that motion. *See* non-PDF Order Granting Motion for Extension of Time dated 5/27/2025.

On June 26, 2025, before any expert report was filed, Ms. Widman filed a motion to withdraw as Petitioner's counsel, with Ms. Bridget McCullough substituting in. ECF No. 42. That motion was granted the same day.

On July 8, 2025, Petitioner filed a motion for an extension of time to file an update on the outstanding expert report. ECF No. 43. The motion stated that Ms. McCullough was reviewing the records and attempting to confer with the retained expert to discern the status of the report. *Id.* at 1. I granted the motion, allowing Petitioner until August 7, 2025, to state how she intended to proceed. *See* non-PDF Order Granting Motion for Extension of Time dated 7/8/2025.

On August 4, 2025, Petitioner filed a status report stating that counsel had spoken with the retained expert and that he remained interested in opining on the case. ECF No. 44. She requested 60 days to file the report, which I granted, setting an October 3, 2025 deadline. *Id*; non-PDF Scheduling Order dated 8/4/25.

On October 2, 2025, Petitioner filed a status report saying that the expert who originally had agreed to opine in this case could no longer do so. Ms. McCullough requested a status conference. ECF No. 45.

I held a status conference on October 9, 2025, with the parties. *See* Minute Entry dated 10/9/2025. Ms. McCullough reported that she had conveyed to Petitioner the difficulties she would face in this case without an expert report. *See* Scheduling Order dated 10/9/2025, ECF No. 46. Ms. McCullough said Petitioner wanted to file an amended petition to update her alleged injury. *See id.* I granted Petitioner 30 days to file an amended petition. *See id.*

On November 11, 2025, Petitioner filed an amended petition alleging that she developed TN caused in fact by her flu vaccination. Am. Pet. at 1.

On December 12, 2025, Respondent filed an amended Rule 4(c) Report arguing this case was still not appropriate for compensation. Am. Resp't's Rep. at 2, ECF No. 51. Respondent asserted Petitioner had failed to demonstrate she suffered from TN, as none of her physicians diagnosed her with TN. Also, Petitioner had not provided any evidence or expert reports to demonstrate how the flu vaccination could/did cause her alleged TN. *Id.* at 20-22.

After the Rule 4(c) Report, Petitioner was directed to file a status report indicating how she would like to proceed. *See* non-PDF Scheduling Order dated 12/15/2025. On January 8, 2026, Petitioner filed a status report stating that she did not intend to file any additional evidence to support her claim for compensation. ECF No. 54.

Petitioner has been given ample opportunity to provide reliable expert evidence in support of her original and amended claims. She has not done so. As discussed below, I conclude after review of the record that Petitioner is not entitled to compensation.

## II.    Fact Evidence

### A. Pre-Vaccination Medical Records

According to the filed records, Petitioner had a complex pre-vaccination history, including a motor vehicle accident in 2014 that affected her cervical spine and necessitated physical therapy, a history of surgeries, fibromyalgia, small fiber neuropathy ("SFN") believed to be secondary to

use of antibiotics, severe leg pain (Ex. 8 at 2); chronic migraines, autoimmune neuropathy, chronic inflammatory demyelinating polyradiculoneuropathy ("CIDP") (Ex. 3 at 23-25); Sjogren's syndrome[3] (Ex. 20 at 8); hypermobility syndrome, dysfunction of the sacroiliac joint, myofascial pain syndrome, for which she received regular nerve blocks (Ex. 8 at 4); dystonia and enthesopathy[4] (Ex. 8 at 77); leukopenia, chronic autoimmune urticaria, and angioedema (Ex. 26 at 18); pelvic pain, polycystic ovarian syndrome, and neutropenia[5] (Ex. 5 at 2); and possible drug-induced lupus, severe eye pain, and ankle pain (Ex. 1 at 65).

Petitioner's primary complaint in the months leading up to her flu vaccination was pelvic and groin pain. On August 24, 2021, she presented to NovaCare Rehabilitation for a physical therapy ("PT") evaluation, complaining of hip and buttock pain as well as burning and itching of the perineal/groin region. Ex. 27 at 5. The history noted she had experienced pelvic pain since 2018, but the pain had worsened the previous month after she discontinued taking prednisone. *Id.* The therapist assessed various musculoskeletal issues and recommended a course of PT. *Id.* at 7.

On August 31, 2021, Petitioner visited St. Luke's Spine and Pain Medicine, complaining of chronic hip and abdominal pain secondary to idiopathic iliopsoas torsion dystonia.[6] Ex. 19 at 34. She said the pain had worsened in July 2021. *Id.* She reported improvement with previous nerve blocks and was considering Botox treatment. *Id.* On exam, she was observed to have a slightly antalgic gait. *Id.* at 37. The assessment was chronic pain syndrome, chronic pain of both hips, and idiopathic torsion dystonia. *Id.* at 34. On September 17, 2021, Petitioner underwent bilateral iliopsoas muscle injections for hip pain. *Id.* at 31.

---

[3] Sjögren syndrome: a symptom complex of unknown etiology, usually occurring in middle-aged or older women, marked by the triad of keratoconjunctivitis sicca with or without lacrimal gland enlargement, xerostomia with or without salivary gland enlargement, and the presence of a connective tissue disease, usually rheumatoid arthritis but sometimes systemic lupus erythematosus, scleroderma, or polymyositis. An abnormal immune response has been implicated. *Sjögren syndrome*, DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=111409 (last accessed on April 13, 2026).

[4] Enthesopathy: disorder of the muscular or tendinous attachment to bone. *Enthesopathy*, DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=16642 (last accessed on April 13, 2026).

[5] Neutropenia: an abnormal decrease in the number of neutrophils in the blood, with the absolute neutrophil count being less than 1500/μL. *Neutropenia*, DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=33915 (last accessed on April 13, 2026).

[6] Idiopathic torsion dystonia: former name for early-onset torsion dystonia. *Idiopathic torsion dystonia*, DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=72188 (last accessed on April 13, 2026). Early-onset torsion dystonia: any of several forms of generalized dystonia resulting from a mutation in DYT genes that code for torsinA; the usual type is caused by mutations in the *DYT1* gene (locus: 9q34), is inherited as an autosomal dominant trait, and affects Ashkenazi Jews more commonly than other groups. It appears before the end of the third decade of life, often in childhood, beginning as an action dystonia in an arm or leg and spreading to affect the trunk and other limbs; when generalized, it results in severe disability. There are several other rare types that are apparently caused by mutations in other DYT genes. *Early-onset torsion dystonia*, DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=72183 (last accessed on April 13, 2026).

Petitioner also routinely saw neurologist Irene Greenhouse, M.D., for CIDP in the months before the vaccination. *See generally* Ex. 3. She had a visit with Dr. Greenhouse on September 9, 2021. *Id.* at 15-17. Dr. Greenhouse noted that Petitioner had been using IVIG for the past several years for "neuropathy and diffuse pain and inflammation." *Id.* Petitioner reported that since her last visit, she was experiencing pain in between her IVIG treatments. *Id.* at 15-16. She was having difficulty inserting the IV at home. *Id.* at 16. She was also having migraines. *Id.* On exam, she had a normal gait but difficulty with balance and decreased sensation to temperature and pinprick in a glove and stocking distribution. *Id.* Dr. Greenhouse stated: "This is a very complicated female with chronic migraines, worsening and progressive autoimmune neuropathy on [IVIG]." *Id.*

On October 13, 2021, the day before the subject vaccination, Petitioner saw rheumatologist Daniel Norden, M.D., regarding her positive ANA[7], neuropathy, and connective tissue disease. Ex. 14 at 25. She reported she had contracted an infection after receiving IVIG and had been seen in the ER.[8] *Id.* She complained of fatigue, pelvic floor issues, and headaches related to her COVID vaccine. *Id.* She was seeing a psychiatrist. *Id.* Her exam was normal, but additional tests and labs were ordered. *Id.* at 27-28. Dr. Norden's assessments included collagen vascular disease with positive ANA, anti-SS-A/Ro antibodies ("SSA"), and SFN; bone density disorder; and polyneuropathy. *Id.* at 28.

## B. Vaccination And Post-Vaccination Medical Records

Petitioner visited her hematologist, Allyson Pishko, M.D., on October 14, 2021, for a follow up regarding her leukopenia and autoimmune neutropenia. Ex. 1 at 11. Her active symptoms included feeling "wiped out," a complaint that prednisone "shuts her whole GI system down," and a previous reaction to methotrexate.[9] *Id.* She was seeing other specialists for her

---

[7] Antinuclear antibodies (ANA): antibodies directed against nuclear antigens; ones against a variety of different antigens are almost invariably found in systemic lupus erythematosus and are frequently found in rheumatoid arthritis, scleroderma (systemic sclerosis), Sjögren syndrome, and mixed connective tissue disease. Antinuclear antibodies may be detected by immunofluorescent staining. Serologic tests are also used to determine antibody titers against specific antigens. *Antinuclear antibodies*, DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=56804 (last accessed on March 30, 2026).

[8] Based on the records filed, this ER visit appears to have occurred on April 20, 2021. On that date, Petitioner went to the ER complaining of fever, chills, and body aches that began 30 minutes after a home IVIG infusion. Ex. 33 at 57. She was afebrile in the hospital, with normal vital signs on exam. *Id.* at 66. She was discharged home several hours later, with Keflex prescribed "in case she is developing a small cellulitis around the IV site in her right arm." *Id.* at 67.

[9] Methotrexate: a folic acid antagonist that acts by inhibiting synthesis of DNA, RNA, thymidylate, and protein; used as an antineoplastic in treatment of a wide variety of malignancies, including acute lymphocytic, meningeal, and acute myelocytic leukemia; gestational choriocarcinoma; chorioadenoma destruens; hydatidiform mole; carcinoma of the breast, lung, and head and neck; non-Hodgkin lymphomas; mycosis fungoides; and osteosarcoma; administered orally. It is also used as an antipsoriatic and antiarthritic in the treatment of severe, recalcitrant, disabling psoriasis and severe rheumatoid and psoriatic arthritis. *Methotrexate*, DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=30930 (last accessed on April 13, 2026).

urticaria and CIDP, and she was receiving IVIG treatment. *Id.* During this appointment, she received the subject flu vaccine. *Id.* at 14.

Eleven days later, on October 25, 2021, Petitioner messaged Dr. Pishko to report that "most of last week" she had been experiencing "an increase in facial, arm, and leg numbness," in addition to severe fatigue, that she believed might be related to her flu vaccine. Ex. 1 at 30. Petitioner stated she was unsure which of her doctors she should call, as she had also started new medications the same week she received the flu vaccine. *Id.*

On October 27, 2021, Petitioner returned to St. Luke's Spine and Pain Medicine complaining of arm, hand, leg, and face pain. Ex. 19 at 16. She reported that "over the past few weeks she has had worsening neuropathic and myofascial pain, most likely as a lupus or CIDP flare-up." *Id.* at 19. She also reported worsening low back pain and lower extremity radicular symptoms and weakness. *Id*. at 18. On exam, she had an antalgic, slow, and painful gait.[10] *Id.* She requested additional imaging. *Id*. at 19. An x-ray and an MRI of the lumbar spine were ordered. *Id*. at 18. No changes were made to her diagnoses. *Id*. The assessment included chronic pain syndrome and weakness and pain of both lower extremities. *Id*.

On November 1, 2021, Petitioner saw neurologist Sami Khella, M.D., for a second opinion regarding the numbness and burning in her legs, arms, and face. Ex. 4 at 2. She reported all her symptoms were "post flu shot." *Id.* Dr. Khella's impression was that the current symptoms were "likely related to Sjogren's." *Id.* at 9. Petitioner was advised to continue IVIG. *Id.*

On November 3, 2021, Petitioner saw Dr. Greenhouse. Ex. 3 at 12. She reported "worsening paresthesias, pain and severe weakness after the flu shot." *Id.* at 13. Dr. Greenhouse ordered an extra dose of IVIG. *Id.* She also ordered an EMG/NCS for three of Petitioner's limbs and indicated that if that study did not show large fiber neuropathy, she would order a skin biopsy to assess for SFN. *Id.* at 13-14.

On November 4, 2021, Petitioner sent a message to Dr. Pishko requesting information about the flu vaccine she was given so she could file a VAERS report, "as per my neurologist who thinks this is GBS."[11] Ex. 1 at 8.

On November 15, 2021, Petitioner went to the Thomas Jefferson University Hospital ("Jefferson") ER with a chief complaint of "facial pain." Ex. 32 at 18. Her medical history was recorded as follows:

> [Petitioner has a history] of Sjogren Syndrome, Lupus, ?GBS, small vessel polyneuropathy with complaint of [f]acial [p]ain. Patient

---

[10] Antalgic gait: a limp adopted so as to avoid pain on weight-bearing structures (as in hip injuries), characterized by a very short stance phase. *Antalgic gait*, DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=77912 (last accessed on April 13, 2026).

[11] Petitioner did not specify which neurologist diagnosed her with GBS. As documented above, she saw two neurologists in the first weeks after vaccination, neither of whom included GBS as a possible diagnosis. Ex. 4 at 2; Ex. 3 at 12.

> reports that on 10/14 she received her influenza vaccine and shortly thereafter began to have increased weakness of her upper and lower extremities as well as increased ataxia and being 'floppy.'  Since [] 10/14 she [has had] significant difficulty with ambulation only able to transfer from her bed to her chair.  Patient received IVIG every 4-6 weeks and has done so for years, last session was finished on 11/05 after 5 days of IVIG.  [She] reports that this has improved her overall weakness however she still feels significant ataxia and burning-type pain which has increased over past 7 days.  Patient takes Lyrica and medical marijuana for her pain.  Over the past 7 days patient complaining of burning facial pain and burning precordial pain.

Ex. 32 at 19.  Petitioner had no weakness on exam, and her labs were normal except for an elevated sedimentation rate.  *Id.* at 22.  She was admitted to the hospital for further testing.  *Id.*

Petitioner was discharged from the hospital on November 19, 2021.  Ex. 32 at 84.  The discharge diagnosis was ambulatory dysfunction.  *Id.*  The discharge summary noted:

> [S]ymptoms started 1 month ago GBS-- however, has had IVIG sessions since and exam now does not appear consistent with GBS. With improvement with steroid possibly still had incompletely treated GBS.

*Id*.

Petitioner followed up with neurologist Dr. Greenhouse on November 22, 2021, for CIDP. Ex. 3 at 10.  She again reported that she "developed worsening paresthesias, pain and severe weakness after the flu shot." *Id.* at 11.  She said she could not walk. *Id.* She also reported severe facial numbness. *Id.*  The assessment was that Petitioner was experiencing a "severe [setback] after the flu shot with worsening gait and neuropathy." *Id.*  Petitioner wanted to return to the ER. *Id.*  Dr. Greenhouse believed two additional days of IV steroids could help. *Id.*  She also recommended an MRI to rule out transverse myelitis. *Id.*

Petitioner returned to Jefferson the same day, complaining of "ambulatory dysfunction and subacute paresthesias after recent hospitalization for the same," with "paresthesias [that] started after flu shot in feet and progressed to upper extremities and face followed by feeling of weakness and off balance." Ex. 20 at 25, 33.  She was assessed as having a "functional neurological symptom disorder" because her "[neurological] exam is not focal, [consistent with] functional neurological disorder[12], [n]ot GBS." *Id.* at 33.

On November 24, 2021, physical therapist Lauren Kerstetter evaluated Petitioner for possible transfer to inpatient rehabilitation.  Ex. 17 at 3.  Ms. Kerstetter noted:

---

[12] Functional disorder: a disorder of physiologic function having no known organic basis. Although not strictly correct, the term is often used in psychiatry as roughly equivalent to "psychogenic disorder"; in other branches of medicine, to "idiopathic disorder." *Functional disorder*, Dorland's, https://www.dorlandsonline.com/dorland/definition?id=71115 (last accessed on April 27, 2026).

> [Petitioner's] exam is consistent with [astasia abasia] gait as well as reported weakness and coordination non focal with normal exam of isolated muscle groups and coordination.  This is representative of a functional neurological disorder.  [One] week ago CSF studies were unremarkable.  Her exam is not consistent with GBS or transverse myelitis.  Given likely not autoimmune mediated, she would not benefit from PLEX at this time as there is no indication and [risk outweighs] benefit…. [Patient's] balance at this time is debilitating and places her at higher risk for falls.  Given this, reasonable to admit for rehab.

*Id.*

On November 27, 2021, Petitioner was transferred to inpatient rehabilitation with an admitting diagnosis of "functional neurological symptom disorder with mixed symptoms." *Id.* at 47.

On November 29, 2021, while she was in inpatient rehabilitation, Petitioner reported that her "trigeminal neuralgia[13] pain [was] bothering her but Prednisone seem[ed] to help." Ex. 17 at 148.  Physical medicine and rehabilitation specialist Rajendra Padhye, M.D., advised that she could discuss treatment with her outpatient neurologist if "trigeminal neuralgia continues to bother her." *Id.*  On November 30, 2021, Petitioner saw an inpatient neurologist at the rehabilitation center, again reporting facial pain and numbness. *Id.* at 81.  The neurologist's assessment included SFN and a functional gait disorder. *Id.* at 85.

On December 9, 2021, Petitioner had a follow-up appointment with Dr. Greenhouse and was recommended to start Oxteller[14] for unclear reasons.  Ex. 3 at 8-9; *see also* Ex. 17 at 483.  There was no mention of TN in the record of that visit, though Dr. Greenhouse again noted Petitioner complained of severe facial numbness. *See* Ex. 3 at 8.  Dr. Greenhouse repeated that Petitioner had experienced a "severe [setback]" after the flu shot with worsening gait and neuropathy." *Id.* at 9.

Later on December 9, 2021, Petitioner saw Dr. Padhye and reported that Dr. Greenhouse had "recommended tapering Lyrica and starting Oxteller for her trigeminal neuralgia once Lyrica taper is completed[.]" Ex. 17 at 483.

---

[13] Trigeminal neuralgia: severe, episodic pain in the area supplied by the trigeminal nerve, often precipitated by stimulation of well-defined trigger points. Called also trifacial n., trifocal n., and tic douloureux. *Trigeminal neuralgia*, DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=92499 (last accessed on March 31, 2026).

[14] Oxteller or oxcarbazepine: an anticonvulsant used in the treatment of partial seizures; administered orally. *Oxcarbazepine*, DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=36142 (last accessed on March 31, 2026).

Petitioner was discharged from rehabilitation on December 11, 2021.  On December 13, 2021, she presented to Daniel Skubick, M.D., for tightness over her upper quarter and paresthesias of her face. Ex. 8 at 88.  On exam, Petitioner exhibited sensory loss to cold sensation and pinprick, which Dr. Skubick described as "characteristic" of SFN.  *Id.*  During a musculoskeletal exam, Dr. Skubick noted that Petitioner's sternomastoid muscle was "exceedingly tight with trigger point activity – such [is] known to produce a sense of tingling and numbness over the face."  *Id.*  He stated:

> [Petitioner's] initial presentation with paresthesias ascending in the legs, arms, and face strongly suggest[ed] neurologic disease yet extensive inpatient evaluation at Jefferson failed to identify a specific etiology - one could speculate that she might have Guillain-Barre syndrome or variations thereof, or some type of central nervous system problem[,] yet[] her reflexes have remained symmetrically unremarkable with absence of the ankle jerks (an old finding).  The negativity of central nervous system disease is further supported by the negative MRI scans of her brain and spine, as well as negative spinal fluid evaluation.

*Id.* at 89.  Dr. Skubick suspected her symptoms were caused by

> hypertonicity of the external rotator group producing numbness and tingling of the legs by entrapment of the sciatic nerve and hypertonicity of the scalene complex producing numbness and tingling of the arms by entrapment of the brachial plexus secondary to elevation first rib. Further, trigger point pathology in sternocleidomastoid[15] is associated with numbness of the face.

*Id.*  He did not diagnose TN.

The next day, Petitioner returned to Dr. Skubick and received nerve blocks to the right upper quarter of the face. Ex. 8 at 91-92.  Three days later, she returned for bilateral nerve blocks to the trigeminal nerves (as well as other nerves).  *Id.* at 94-96.  Dr. Skubick's assessment after administering the blocks was "[b]ilateral upper quarter myofascial pain syndrome - the lateral pterygoid[16] is prominently involved bilaterally."  *Id.* at 96.  Petitioner received additional nerve blocks on January 7 and February 21, 2022.  *Id.* at 98, 101.

---

[15] Sternocleidomastoid: pertaining to the sternum, clavicle, and mastoid process. *Sternocleidomastoid*, DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=47183 (last accessed on April 13, 2026).

[16] Lateral pterygoid muscle or musculus pterygoideus lateralis: origin, caput superius—infratemporal surface of greater wing of sphenoid and infratemporal crest; caput inferius—lateral surface of lateral pterygoid plate; insertion, neck of condyle of mandible, temporomandibular joint capsule; innervation, mandibular; action, protrudes mandible, opens jaws, moves mandible from side to side. *Musculus pterygoideus lateralis*, DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=90872 (last accessed on April 13, 2026).

On January 5, 2022, Petitioner had an initial outpatient visit with rheumatologist Carol Nasr, M.D., a rheumatology fellow at Jefferson. Ex. 13 at 14. Attending physician Marianthi Kiriakidou, M.D., also signed off on the record. *Id.* at 24. Petitioner reported that since her discharge from the hospital, she continued to have persistent facial numbness, but it had improved. *Id.* at 14. She said she had been "diagnosed with possible trigeminal neuralgia and started on [Oxteller] ([L]yrica tapered off)." *Id.* Based on that report, Dr. Nasr assessed "TN" that was being followed by Dr. Greenhouse. *Id.* at 23. She also assessed "neuropathy" generally, noting that Petitioner was following with Dr. Greenhouse and Dr. Khella and that her "[r]ecent hospitalization [was] likely exacerbated by flu vaccine." *Id.*

On January 25, 2022, Petitioner had an EMG/NCS study. Ex. 4 at 35. The study was normal. *Id.* at 35-36.

On February 18, 2022, Petitioner saw rheumatologist Chadwick R. Johr, M.D., for a second opinion regarding her symptoms. Ex. 20 at 13. Dr. Johr took a lengthy history from Petitioner, which included her report of "TN" and "GBS" secondary to her flu vaccination. *Id.* at 13-14. Dr. Johr did not diagnose TN or any other new condition. *Id.* at 15. He did not recommend any medication changes but suggested an ophthalmology exam and lab testing for medication toxicity. *Id.*

On May 6, 2022, Petitioner was evaluated by Dr. Skubick for reported "trigeminal neuralgia." Ex. 30 at 20. Dr. Skubick noted that Petitioner's description of her symptoms did not align with the classical description of TN, stating:

> I saw [petitioner] in follow up today to evaluate and treat her "trigeminal neuralgia[.]" By this she means pain in the jaw and face with some accompanying numbness and tingling that seems exacerbated by talking and chewing. She does not describe the classical description of *tic douloureux*[.]

*Id.* (emphasis in original). Instead, Dr. Skubick assessed bilateral upper quarter myofascial pain syndrome, with the lateral pterygoid and masseter[17] prominently involved. *Id.* at 21.

During a follow-up appointment with Dr. Greenhouse for CIDP on June 23, 2022, Petitioner reported that she was told in rehabilitation she had trunk ataxia and bilateral TN.[18] Ex. 3 at 4. Dr. Greenhouse did not independently diagnose TN.

---

[17] Musculus masseter: masseter muscle: origin, pars superficialis—zygomatic process of maxilla and inferior border of zygomatic arch, pars profunda—inferior border and medial surface of zygomatic arch; insertion,pars superficialis—angle and ramus of mandible, pars profunda—superior half of ramus and lateral surface of coronoid process of mandible; innervation, masseteric, from mandibular division of trigeminal; action, raises mandible, closes jaws. *Musculus masseter*, DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=90806 (last accessed on April 13, 2026).

[18] All notes from the rehabilitation facility indicated that Petitioner consistently reported TN pain, but no official diagnosis of TN was ever made. *See generally* Ex. 17.

On August 29, 2022, Petitioner saw Dr. Skubick for additional upper quarter nerve block injections. Ex. 30 at 36. She reported that she believed she was improving but when she received IVIG, her jaw pain worsened. *Id*. Dr. Skubick noted that petitioner's jaw symptomatology was partially based on trigger points and that her exam showed ongoing trigger point activity throughout the upper quarter, with definite involvement of the masseter. *Id*. Dr. Skubick administered bilateral upper quarter nerve blocks. *Id*. at 36-37.

On September 23, 2022, Dr. Skubick referred Petitioner to Tsao-Wei Liang, M.D., for a second opinion regarding the "possibility of an autoimmune cerebellar dysfunction." Ex. 30 at 45. Dr. Skubick noted that he had followed Petitioner since 2015 for "widespread myofascial pain." *Id*. He noted that, after the subject flu vaccination, Petitioner developed "an acute cerebellar syndrome with significant ataxia" but was not diagnosed with anything specific at Jefferson. *Id*. Instead, a functional neurologic disorder was suspected. *Id*. Dr. Skubick disagreed that Petitioner had a functional disorder and believed she might have "some type of autoimmune cerebellar dysfunction triggered by the flu vaccination." *Id*.

Petitioner saw Dr. Liang and Brianna Casey, M.D. (neurology resident) on January 29, 2023. Ex. 30 at 63-68. Her brain MRI showed no signs of cerebral or cerebellar atrophy. *Id*. at 63. No additional medical treatments were recommended, but Petitioner was advised to continue physical and vestibular therapy. *See id*.

On September 13, 2023, Petitioner was seen in the Jefferson ER for a motor vehicle accident in which she was struck from behind by a car traveling more than 40 miles per hour. Ex. 33 at 12. Her imaging showed no traumatic injuries, and she was discharged the same day with a diagnosis of muscle strain. *Id*. at 14.

On April 22, 2024, Petitioner saw neurologist Goran Rakocevic, M.D., at Jefferson. Ex. 29 at 2. The assessment was SFN in the context of Sjogren's syndrome. *Id*. at 22. Dr. Rakocevic did not diagnose TN. *Id*.

### C. Petitioner's Affidavit

In her affidavit, executed July 1, 2022, Petitioner stated that before her October 14, 2021 vaccination, she was very active, enjoying family activities and hobbies. Ex. 2 at 1. She claimed her neuropathy was well controlled with IVIG. *Id*. After the vaccination, she developed "increasing numbness/burning of the extremities" and "a new pervasive numbness across [her] face." *Id*. at 2. After speaking with her neurologist, Petitioner received additional IVIG, but "within 2 weeks following the course, [she] steadily declined[.]" *Id*. She stated that, while in rehabilitation, "[d]rinking, talking, eating, brushing [her] teeth were all very difficult as they increased [her] pain, which was diagnosed as trigeminal neuralgia (injury of the 5th cranial nerve)." *Id*. Her facial symptoms had persisted since then. *Id*. at 4.

## III.    Legal Framework

Under the Vaccine Act, a petitioner may prevail in one of two ways. First, she may show that she suffered a Table injury within the time provided in the Table. § 11(c)(1)(C)(i). "In such

11

a case, causation is presumed." *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1320 (Fed. Cir. 2006); *see* § 13(a)(1)(B).  Second, where the alleged injury is not listed in the Table, she may demonstrate that she suffered an "off-Table" injury that was caused-in-fact by his vaccination. § 11(c)(1)(C)(ii).

For both Table and non-Table claims, Vaccine Program petitioners bear a "preponderance of the evidence" burden of proof.  § 13(a)(1).  That is, a petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence."  *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010); *see also Snowbank Enter. v. United States*, 6 Cl. Ct. 476, 486 (1984) (mere conjecture or speculation is insufficient under a preponderance standard).  The petitioner must demonstrate that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury."  *Moberly*, 592 F.3d at 1321 (quoting *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Hum. Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006).  A petitioner may not receive a Vaccine Program award based solely on her assertions; rather, the petition must be supported by either medical records or medical opinion.  § 13(a)(1).

In attempting to establish entitlement to a Vaccine Program award of compensation for a non-Table claim, a petitioner must satisfy all three of the elements established by the Federal Circuit in *Althen v. Secretary of Health and Human Services*.  418 F.3d 1274 (Fed. Cir. 2005). *Althen* requires a petitioner to establish by preponderant evidence that the vaccination caused her injury "by providing: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury."  *Id.* at 1278.

Each of the *Althen* prongs requires a different showing.  Under *Althen* prong one, a petitioner must provide a "reputable medical theory" demonstrating that the vaccine received *can cause* the type of injury alleged.  *Pafford*, 451 F.3d at 1355-56 (citations omitted).  To satisfy this prong, a petitioner's theory must be based on a "sound and reliable medical or scientific explanation."  *Knudsen v. Sec'y of Health & Hum. Servs*., 35 F.3d 543, 548 (Fed. Cir. 1994) (citations omitted).  Such a theory must only be "legally probable, not medically or scientifically certain."  *Id.* at 548-49; *Bunting v. Sec'y of Health & Hum. Servs.,* 931 F.2d 867, 873 (Fed. Cir. 1991).

A petitioner may satisfy the first *Althen* prong without resort to medical literature, epidemiological studies, demonstration of a specific mechanism, or a generally accepted medical theory.  *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1378-79 (Fed. Cir. 2009) (citing *Capizzano*, 440 F.3d at 1325-26).  Despite their expertise, special masters are not empowered by statute to conclusively resolve what are complex scientific and medical questions, and thus scientific evidence offered to establish *Althen* prong one is viewed "not through the lens of the laboratorian, but instead from the vantage point of the Vaccine Act's preponderant evidence standard."  *Id.* at 1380.  However, this does not negate or reduce a petitioner's ultimate burden to

establish her entitlement to compensation by preponderant evidence. *W.C. v. Sec'y of Health & Hum. Servs.*, 704 F.3d 1352, 1356 (Fed. Cir. 2013) (citations omitted).

The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a petitioner's medical records. *Althen*, 418 F.3d at 1278; *Andreu*, 569 F.3d at 1375-77; *Capizzano*, 440 F.3d at 1326 (stating that "medical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury'") (quoting *Althen*, 418 F.3d at 1280). Medical records are generally viewed as particularly trustworthy evidence because they are created contemporaneously with the treatment of the patient. *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). However, the existence of medical records and/or statements of treating physician views does not require the special master to adopt their conclusions *per se*. § 13(b)(1) (providing that "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court"); *Snyder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 746 n.67 (2009) ("[T]here is nothing . . . that mandates that the testimony of a treating physician is sacrosanct–that it must be accepted in its entirety and cannot be rebutted."). As with expert testimony offered to establish a theory of causation, the opinions or diagnoses of treating physicians are only as trustworthy as the reasonableness of their suppositions or bases. The views of treating physicians should also be weighed against other, contrary evidence in the record— including conflicting opinions among such individuals. *Hibbard v. Sec'y of Health & Hum. Servs.*, 100 Fed. Cl. 742, 749 (2011) (it was not arbitrary or capricious for special master to weigh competing treating physicians' conclusions against each other), *aff'd*, 698 F.3d 1355 (Fed. Cir. 2012); *Caves v. Sec'y of Health & Hum. Servs.*, No. 06-522V 2011 WL 1935813, at *17 (Fed. Cl. Spec. Mstr. Apr. 29, 2011), *mot. for review den'd*, 100 Fed. Cl. 344, 356 (2011), *aff'd without opinion*, 475 Fed. App'x 765 (Fed. Cir. 2012).

The third *Althen* prong requires establishing a "proximate temporal relationship" between the vaccination and the injury alleged. *Althen*, 418 F.3d at 1281. That term has been equated to the phrase "medically acceptable temporal relationship." *Id.* Thus, a petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation." *de Bazan v. Sec'y of Health & Hum. Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). The explanation for what is a medically acceptable timeframe must also be consistent with the theory for how the relevant vaccine can cause the alleged injury (*Althen* prong one's requirement). *Id.* at 1352; *Shapiro v. Sec'y of Health & Hum. Servs.*, 101 Fed. Cl. 532, 542 (2011), *recons. denied after remand on other grounds*, 105 Fed. Cl. 353 (2012), *aff'd without op.,* 503 F. App'x 952 (Fed. Cir. 2013); *Koehn v. Sec'y of Health & Hum. Servs.*, No. 11-355V, 2013 WL 3214877 (Fed. Cl. Spec. Mstr. May 30, 2013), *aff'd*, 773 F.3d 1239 (Fed. Cir. 2014).

Lastly, as a threshold matter before the *Althen* prongs can even be evaluated, a petitioner must preponderantly prove she suffered the injury alleged. *Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1346 (Fed. Cir. 2010). "Although the Vaccine Act does not require absolute precision, it does require the petitioner to establish an injury – the Act specifically creates a claim for compensation for 'vaccine-related injury or death.'" *Stillwell v. Sec'y of Health & Hum. Servs.*, 118 Fed. Cl. 47, 56 (2014) (quoting 42.U.S.C. § 300aa-11(c)). Accordingly, the Federal Circuit has concluded that it is "appropriate for the special master to first determine what

injury, if any, [is] supported by the evidence presented in the record" before applying a causation analysis pursuant to *Althen.  Lombardi v. Sec'y of Health & Hum. Servs.*, 656 F.3d 1343, 1351-53 (Fed. Cir. 2011).

### IV.    Analysis

At this time, Petitioner's sole claim is that she developed trigeminal neuralgia caused-in-fact by her flu vaccination.  Am. Pet. at 1.  As noted, a Vaccine Act petitioner cannot prevail on the basis of her claims alone.  Instead, she must preponderantly prove her case with either expert opinion and/or medical record evidence establishing diagnosis and vaccine causation.  Here, as described above, Petitioner, who was represented by counsel, was given ample time to secure an expert to opine on her behalf.  She failed to do so and therefore did not produce any expert opinion relating to either diagnosis or causation.  Thus, the only way in which Petitioner could prevail on her claim would be through medical record evidence.  *See* § 13(a)(1).

#### A. Diagnosis of Trigeminal Neuralgia

The diagnosis of TN was not adequately substantiated by the medical records, nor has Petitioner offered any expert opinion supporting it.  Importantly, none of petitioner's physicians independently diagnosed her with TN.  In fact, neurologist Dr. Skubick specifically considered and rejected TN as a diagnosis; he instead diagnosed myofascial pain syndrome affecting the facial muscles.  *See* Ex. 8 at 89, 96; Ex. 30 at 20 ("I saw [petitioner] in follow up today to evaluate and treat her "trigeminal neuralgia[.]"  By this she means pain in the jaw and face with some accompanying numbness and tingling that seems exacerbated by talking and chewing. She does not describe the classical description of *tic douloureux* [TN].").

I do note that Petitioner herself reported having "TN" to multiple physicians.  Some of the providers reiterated *her* reports that she had been diagnosed with TN, but none of them independently confirmed the diagnosis.  *See, e.g.,* Ex. 3 at 4 (Dr. Greenhouse noting that "[i]n rehab, she was told trunk ataxia and bilateral trigeminal"); Ex. 13 at 24 (rheumatologist Dr. Nasr including "TN" on the assessment list but noting that Petitioner was being followed by Dr. Greenhouse for that condition); Ex. 17 at 148 (Dr. Padhye reporting "trigeminal neuralgia pain bothering her" during rehabilitation), 483 (Dr. Padhye noting that Petitioner "was recommended tapering Lyrica and starting Oxteller for her trigeminal neuralgia once Lyrica taper is completed per her neurologist."); Ex. 20 at 15 (Dr. Johr's notation that Petitioner's "TN" had worsened since tapering off prednisone).  This is inadequate to prove diagnosis in the Vaccine Program.  *See Rothenberg v. Sec'y of Health & Hum. Servs.,* No. 15-696V, 2018 WL 2731639, at *16 (Fed. Cl. Apr. 19, 2018) ("Program petitioners cannot establish a diagnosis simply by citing to records in which *they* informed physicians of a diagnosis that the evidence does not corroborate – any more than they can prevail in a case simply based on their own averments.") (citing *Castaldi v. Sec'y of Health & Hum. Servs.*, No. 09–300V, 2014 WL 3749749, at *11 (Fed. Cl. Spec. Mstr. June 25, 2014), *mot. for rev. denied*, 119 Fed. Cl. 407 (2014)).

#### B. Causation

14

Petitioner's medical records also failed to support the allegation that October 14, 2021 flu vaccine caused her condition.[19]  Her treating physicians did not persuasively attribute her purported facial symptoms to the vaccine.  And Petitioner, as noted, failed to secure an expert to opine she suffered a vaccine-caused injury.

Dr. Greenhouse did state on several occasions that Petitioner seemed to have suffered a "setback" after her flu vaccination.  *See* Ex. 3 at 11.  In using the term "setback," Dr. Greenhouse generally referenced "worsening . . . neuropathy" but did not explain this comment any further. *Id.*  Similarly, Dr. Nasr briefly commented that Petitioner had "neuropathy" and that her recent hospitalization had likely been "exacerbated" by the subject vaccination.  Ex. 13 at 23-24.  Dr. Skubick remarked that Petitioner might have "autoimmune cerebellar dysfunction triggered by the flu vaccination"; but again, he did not believe Petitioner had TN.  Ex. 30 at 20, 45.  None of these summary comments persuasively linked the vaccination to a cognizable injury, including TN, as is required to prove causation.

## V.    **Conclusion**

I am sympathetic to Petitioner's health struggles.  The evidence, however, does not preponderantly prove that she sustained the alleged vaccine-caused injury.

As such, I conclude Petitioner is not entitled to compensation. **The Clerk shall enter judgment in accordance with this decision.** [20]

If Petitioner wishes to preserve her right to file a civil action in this case, she must file an election in writing with the Clerk of Court indicating her intent to file a civil action for damages within 90 days after entry of judgment.  *See* Vaccine Rule 12(a).

**IT IS SO ORDERED.**

**s/ Jennifer A. Shah**
Jennifer A. Shah
Special Master

---

[19] While their decisions are not binding on me, I note that other special masters who have adjudicated TN claims have denied compensation for failure to preponderantly establish that vaccinations can cause the condition, even with expert reports.  *See*, *e.g.*, *Torres v. Sec'y of Health and Hum. Servs.,* No. 21-1356V, 2026 WL 287734 (Fed. Cl. Spec. Mstr. Jan. 9, 2026); *Timothy v. Sec'y of Health and Hum. Servs.,* No. 16-998V, 2023 WL 2658060 (Fed. Cl. Spec. Mstr. Mar. 28, 2023).

[20] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by each party filing a notice renouncing the right to seek review.